## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **MARSHALL F. HAYNES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:11cv0547 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the application of Marshall Haynes (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB in June 2008, alleging he was disabled as November 27, 2007, by severe chronic arm pain and high blood pressure. (R.[1] at 119-21.) His application was denied initially and after a hearing held in September 2009 before Administrative Law Judge (ALJ) Bradley Hanan. (Id. at 8-22, 27-76.) The Appeals Council then denied

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

**Testimony Before the ALJ**

Plaintiff, represented by counsel, and Delores Gonzalez, M.Ed., a vocational expert (VE), testified at the administrative hearing.

Plaintiff was 54 years old at the time of the hearing.  (Id. at 33.)  He is 5 feet 10 ½ inches tall and weighs 241 pounds.  (Id.)  Although his normal weight is 180 pounds, he has not weighed that little for the past two years due to his decreased level of activity.  (Id. at 33-34.)  He has an Associate of Arts degree in business management and served as a Marine from 1972 to 1975.  (Id. at 34-35.)  He was not honorably discharged.  (Id. at 35.)  He has a current driver's license, although his wife does most of the driving because he falls asleep at the wheel and his arms become numb.  (Id. at 35, 36.)  He lives with his wife.  (Id. at 35.)  Although they have five children between them – his wife has a son; he has a daughter; and they have three daughters together – none live at home on a permanent basis.  (Id.)

Plaintiff last worked doing custodial tasks at Kirkwood Stair after being released to return to work following an on-the-job injury.  (Id. at 37.)  He had been working for that company since October 2001 driving a truck and delivering stair parts.  (Id. at 38.)  In June 2007, his left rotator cuff was injured when windows fell on it.  (Id. at 42-43.)  After being in physical therapy, he had surgery on the shoulder in November 2007.  (Id. at 44-45.)  He continued to go to physical therapy until March 2008, when his doctor told him there was nothing else he could do and released him to return to work.  (Id. at 45.)  And, because he

continued to have problems with his left shoulder after surgery and because of the pain medication he was taking, he was assigned the custodial tasks after returning to work.  (Id. at 38, 45-46.)  He returned to work in October 2007 and was laid off the next month because he did not have the training to work on the machines.[2]  (Id. at 39-40.)

After the shoulder surgery proved to be unsuccessful, Plaintiff consulted the doctor who had performed rotator cuff surgery on his right shoulder in 1995.  (Id. at 46.)  That doctor and another doctor his union referred him to both opined that the surgery should be redone.  (Id. at 46-47.)  The doctor the worker's compensation carrier sent him to opined that all that could medically be done had been done.  (Id. at 47.)

The surgery on the left shoulder was never redone; however, the doctor referred by the union did repair the right rotator cuff.  (Id.)  Plaintiff has a worker's compensation claim pending for the left shoulder injury.  (Id. at 48.)

Plaintiff continues to have problems with his left shoulder.  (Id.)  He is no longer able to reach above his head as far as he used to and has a "rachet feeling" when he rotates the shoulder in a certain way.  (Id.)  Also, he has pain that radiates from his left shoulder to his elbow.  (Id.)  He no longer takes pain medication because he does not like the way it makes him feel.  (Id.)  He further testified that he took only one Oxycontin pill because it made him stop breathing.  (Id. at 58.)

He is right-handed, but is also unable to reach with that arm as he had been.  (Id. at 49.)  Specifically, he cannot reach behind him as he used to do and can not lift his right arm

_____

[2]The discrepancy in times is not explained.

higher than shoulder level.  (Id.)  If he tries to reach beyond his limits, he experiences pain radiating from his shoulder to his hand.  (Id. at 50.)  His grip strength is not what it used to be.  (Id.)  It is uncomfortable for him to brush his teeth and shave.  (Id.)  He does limited household chores, e.g., he can rinse a dish and put it in the sink.  (Id.)  And, he can no longer use his carpentry tools like he used to do.  (Id. at 51-52.)  If he attempted to do carpentry work, after thirty to forty-five minutes the pain in his arms would be unbearable and he would then have to rest for one to two hours.  (Id. at 52.)

Because he has a problem falling asleep at random times, his doctor wants him to be evaluated for sleep apnea.  (Id. at 37, 59.)  The problem began two to three years earlier.  (Id. at 52.)

Plaintiff recently began seeing Dr. Crane to address such issues as his short temper.  (Id. at 53-54.)  He was prescribed Lexapro.  (Id. at 53.)  Also, he has difficulty staying focused on a task.  (Id. at 54-55, 61-62.)

Before working for Kirkwood Stair, he worked for Royal Gate Dodge for five months as a service manager at the oil change rack.  (Id. at 40.)  That job ended when he was injured on the job.  (Id. at 41.)  Before Royal Gate Dodge, he worked for Don Flier Motors doing porter work, driving a truck, and delivering parts.  (Id.)  That job ended when he was laid off after two and one-half years.  (Id.)  Before that job, he worked at Six Flags helping to set up the new water park.  (Id.)  Before that job, he ran a photography business for a California company.  (Id. at 42.)  The business employed between forty-five to sixty people, and he did the training, the sales, payroll, and other management duties.  (Id.)

Plaintiff described a typical day as arising around 4:30 to 5:00 in the morning after falling asleep two or three hours earlier, doing any household chore he can, walking or sitting and reading, eating cereal for breakfast around 8:00 or 8:30 a.m., and watching televison with his wife.  (Id. at 55, 56-57.)  They also watch television in the afternoon and evening.  (Id. at 57.)  He has a "handful of friends."  (Id.)  He no longer goes to church as he used to; there is no particular reason why not.  (Id.)  He no longer works on his car because laying on his back underneath the car is hard on his shoulders.  (Id. at 58.)

Plaintiff has had the same sleeping pattern at night for the past twenty-five to thirty years.  (Id. at 56.)

Ms. Gonzalez classified Plaintiff's past work as a photographer in an amusement park as light, semiskilled and as the retail manager of the photography studio as light, skilled; his work as a porter for the car dealership as medium, unskilled; as a service writer for the dealership as light, skilled; as an auto parts deliveryman as medium, semi-skilled; as a box truck driver as medium, semi-skilled; as a landscape laborer as heavy, unskilled; as a carpenter for a mobile home service as medium, skilled; as a janitor as heavy, unskilled; and as a pest control worker as light, semi-skilled.  (Id. at 65.)

She was then asked by the ALJ to assume the following hypothetical person.

[A] person of [Plaintiff's] age, education and work experience.  This individual is limited to work within the light exertional category who is unable to climb ramps, stairs, ladders, ropes or scaffolds.  Is bilaterally unable to extend his arms to reach or to reach overhead only occasionally for both, a [sic] manipulative exertions.  He is – this individual is to not be exposed to any extreme cold or any extreme vibrations and this individual is to have only occasional interaction with the public and occasional interaction with co-workers.

(Id. at 66.)  Ms. Gonzalez testified that such a person could not perform any of Plaintiff's past relevant work because of the reaching.  (Id.)  There were, however, other jobs he could perform.  (Id.)  These jobs included election clerk and surveillance system monitor, both of which existed in significant numbers in the national and state economies.  (Id. at 66-67.)

If this person was unable to fully reach overhead, the job of election clerk would be eliminated.  (Id. at 67.)  And, although Plaintiff would have acquired some management skills at a prior job, any jobs to which those skills would be transferable would also require contact with others at the work site.  (Id. at 68.)  If this person was limited to no interaction with co-workers and only occasional interaction with supervisors, the job of surveillance system monitor would still be appropriate.  (Id.)

After the hearing, the ALJ sent the VE some interrogatories, explaining that he had "inadvertently omitted some qualifying terms and additional specific limitations in certain hypotheticals" he had asked her during the hearing.  (Id. at 238.)  In addition to Plaintiff's age, education, and work experience, the first hypothetical described an individual who has the residual functional capacity (RFC) to perform light work except he is unable to climb ramps, stairs, ropes, ladders, or scaffolds; is limited to not reaching higher than waist level; must avoid all exposure to cold and vibrations; and could have only occasional contact with the public and co-workers.  (Id. at 244.)  The VE answered that this individual could not perform Plaintiff's past relevant work as he performed it or as it is normally performed in the national economy.  (Id.)  This individual could perform other work:  specifically, that of a grinder, pretzel twister, lacer, microfilm processor, and collator operator.  (Id. at 245.)  Her answer

- 6 -

would be unchanged if this person was also limited to no crawling, *no* contact with the public, and occasional contact with co-workers. (Id. at 245-46.) Her answers are consistent with the *Dictionary of Occupational Titles* (DOT). (Id. at 246.)

<u>**Medical and Other Records Before the ALJ**</u>

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, medical records, and various evaluations.

When applying for DIB, Plaintiff completed a Disability Report. (Id. at 174-82.) He is 5 feet 10 inches tall and weighs 235 pounds. (Id. at 174.) He is unable to work because of severe chronic pain in his arms, high blood pressure, fatigue, and depression. (Id. at 175.) He has difficulty using his arms above his shoulders or behind him or when tying his shoes. (Id.) He has difficulty driving. (Id.) It is painful for him to hold his arms out in front of him. (Id.) He has difficulty bending to pick up objects, and does not have much strength. (Id.) Because of his pain, his blood pressure is elevated. (Id.) He is fatigued and has blackouts when trying to complete a task. (Id.) Because of the pain in his shoulders and arms, he cannot lift or carry anything. (Id.) Because of these impairments, he became unable to work on November 27, 2007. (Id.) He had tried to return to work, but was unable to due to his pain. (Id.) He eventually stopped working on March 10, 2008. (Id.) His medications included Meloxicam (for symptoms of osteoarthritis), Naprosyn (an anti-inflammatory and pain reliever), Vicodin (an opioid pain reliever), and Oxycontin (an opioid pain reliever). (Id.

- 7 -

at 180.)  The second and third were prescribed by Dr. Milne; the fourth by Dr. Sigmund.

(Id.)  Oxycontin caused him to be short of breath.  (Id.)

 Plaintiff also completed a Function Report.  (Id. at 194-201.)  He did not answer the

question asking him to describe his daily activities.  (Id. at 194.)  He reported that he had to

have help dressing, bathing, and caring for his hair.  (Id. at 195.)  He also needs help

remembering to take his medications in the morning and after lunch.  (Id. at 196.)  His

stamina is not what it used to be.  (Id.)  He uses a riding mower to cut his lawn, taking at least

two hours to mow less than an acre.  (Id.)  He only drives when it is necessary and there is

no one else available.  (Id. at 197.)  He shops once a week for food, cleaning supplies, and

clothing; these excursions last thirty minutes.  (Id.)  He is no longer able to do his former

hobbies of fishing, swimming, and boating.  (Id. at 198.)  He occasionally attends church.

(Id.)  Because of his pain, he is reluctant to socialize.  (Id. at 199.)  His impairments

adversely affect his abilities to lift, reach, sit, climb stairs, remember, complete tasks,

concentrate, use his hands, and get along with others.  (Id. at 199.)  He is able to walk a

quarter of a mile at most before having to stop and rest for ten to fifteen minutes.  (Id.)  He

can pay attention for no longer than an hour.  (Id.)  Concentration is a problem when he tries

to follow written instructions.  (Id.)  He gets along fine with authority figures.  (Id.)  He had

been fired from his recent job at Kirkwood Stair Company after a misunderstanding with a

supervisor.  (Id. at 200.)  He does not handle stress very well.  (Id.)

 Plaintiff's wife completed a Function Report on his behalf.  (Id. at 210-18.)  She

reported that Plaintiff goes to physical therapy three times a week.  (Id. at 210.)  She assists

him in dressing, bathing, caring for his hair, and shaving.  (Id. at 211.)  He needs to be reminded to take his medication.  (Id. at 212.)  Using a riding mower, it takes Plaintiff four hours to cut less than an acre of grass.  (Id.)  He needs help getting motivated to do this chore.  (Id.)  Plaintiff does not interact with many people because he is withdrawn and distant.  (Id. at 214.)  His impairments adversely affect his abilities to lift, use his hands, follow instructions, reach, complete tasks, and get along with others.  (Id. at 215.)  He cannot lift anything heavier than two pounds.  (Id.)  He does not get along well with authority figures.  (Id.)  He was fired from his recent job with Kirkwood Stair Company.  (Id. at 216.)  He does not handle stress or changes in routine well.  (Id.)

After the initial denial of his application, Plaintiff competed a Disability Report - Appeal form.  (Id. at 230-34.)  There had been no changes in his impairments or any new impairments.  (Id. at 230.)

Also before the ALJ were medical records for Plaintiff, summarized below in chronological order and beginning on June 25, 2007, when Plaintiff consulted Bobby Enkvetchakul, M.D., M.P.H., for complaints of left arm pain.  (Id. at 268-69.)  He reported that he had had ongoing pain in that shoulder and arm and numbness in the left hand since some windows he and coworkers had been unloading from a truck had fallen on him five days earlier.  (Id. at 268.)  On examination, he had no swelling or erythema in the left shoulder, but did have diffuse tenderness to palpation posteriorly over the shoulder girdle.  (Id.)  His active and passive ranges of motion in the shoulder were limited on abduction to ninety degrees.  (Id.)  His internal rotation was almost normal.  (Id.)  His strength was

"minimally weak," i.e., 5-/5 with complaints of pain.  (Id.)  A drop-arm test[3] was negative; an impingement test[4] and any motion in the left shoulder caused complaints of pain.  (Id.) X-rays were negative for any acute findings.  (Id. at 268.)  Dr. Enkvetchakul's diagnosis was left shoulder pain.  (Id. at 268.)   He prescribed Naprosyn and physical therapy three times a week for two weeks.  (Id.)  He also restricted Plaintiff to modified duty.  (Id.)

Returning two weeks later, on July 3, Plaintiff reported having had no improvement in his pain.  (Id. at 270.)  He further reported that the physical therapy was not helping.  (Id.) His pain was also emanating from the left side of his cervical region.  (Id.)  Dr. Enkvetchakul noted that Plaintiff "appear[ed] comfortable during the interview and examination process." (Id.)  The active range of motion in Plaintiff's left shoulder was 70 degrees on abduction and 60 to 70 on flexion.  (Id.)  "Any type of provocative testing such as impingement testing or any motion at all of the left shoulder produced complaints of pain."  (Id.)  Deep tendon reflexes were symmetrically diminished in the upper extremities.  (Id.)  Plaintiff could make a full fist.  (Id.)  The sensation and circulation in his left upper extremity was intact.  (Id.) The only significant finding of an x-ray of his cervical spine was some straightening.  (Id.)

---

[3]This test "evaluates for a supraspinatous muscle tear. . . .  The test is positive if the patient is unable to keep arms elevated after the examiner releases."  Univ. of Mich., Musculoskeletal Shoulder Examination, http://sitemaker.umich.edu/fm_musculoskeletal_shoulder/drop_arm_test (last visited Aug. 9, 2012).

[4]An impingement test is performed by internally rotating a sitting patient's arm with the thumb facing downward and abducting and forward flexing the arm.  NISMAT, Physical Evaluation of the Shoulder,  http://www.nismat.org/orthocor/exam/shoulder.html#Evaluation  (last visited Aug. 9, 2012).  "If impingement is present, the patient will experience pain as the arm is abducted."  Id.

Plaintiff was directed to continue with his medication and with physical therapy.  (Id.)  The diagnosis was the same; he was restricted to working with his left arm at his side.  (Id.)

When Plaintiff next saw Dr. Enkvetchakul, on July 18, his complaints and lack of improvement were as before.  (Id. at 271-72.)  After examining Plaintiff, Dr. Enkvetchakul noted that Plaintiff's "pain complaints [were] in a somewhat bizarre pattern."  (Id. at 271.) "The pain location would change depending on the type of motion performed at the left shoulder.  He could voluntarily move the left shoulder in various patterns and have changing pain complaints."  (Id.)  He was given a subacromial injection and lidocaine.  (Id.)  The injection gave him no relief.  (Id. at 272.)  Because of this, the unusual pain pattern, and a negative cervical magnetic resonance imaging (MRI),[5] Dr. Enkvetchakul characterized the left shoulder pain as being of uncertain etiology and decided to refer Plaintiff for a second opinion examination.  (Id.)

Reporting that he had begun to have joint pain throughout his entire body shortly after leaving the office, Plaintiff was seen again by Dr. Enkvetchakul the next day.  (Id. at 273-74.) After examining Plaintiff, Dr. Enkvetchakul concluded that joint pains were the result of a viral infection and unrelated to the injection.  (Id. at 273.)  Plaintiff was instructed to follow up with primary care physician for treatment of the joint pains.  (Id.)

Plaintiff consulted Mark D. Rickmeyer, D.O., with Patients First Health Care, LLC (Patients First) on August 1 "to establish as a new patient."  (Id. at 439-41.)  He reported

---

[5]The MRI results themselves are not in the record.

having numbness and a positive Tinel's sign[6] in his left hand and a stiff and tender neck since being pinned under glass panes in June.  (Id. at 439.)  He was taking Naprosyn for the pain. (Id.)  Dr. Rickmeyer prescribed routine tests, e.g., a colonoscopy and fasting blood profiles, and scheduled Plaintiff to return in one month with his blood pressure diary readings.  (Id. at 441.)

Plaintiff underwent an independent medical evaluation on August 2 by Michael J. Milne, M.D.  (Id. at 277-78, 286, 365-67, 407-09, 421-24.)  Plaintiff's chief complaint was of an injury to his left shoulder and spine from falling windows.  (Id. at 277-78.)  He described the pain as a nine on a ten-point scale, as constant and sharp, and as present with standing, sitting, or trying to sleep.  (Id. at 278, 286.)  Nothing made it better; trying to work made it worse.  (Id.)  On examination he was – as he had been with Dr. Enkvetchakul – in no acute distress.  (Id.)  His mood, affect, and general appearance were all normal.  (Id.)  He had normal musculature and a limited range of motion in his right shoulder.  (Id.)  He had a range of motion in his left shoulder restricted to 90 degrees on active forward flexion, to 82 on abduction, to 75 on internal rotation, and to 50 on external rotation.  (Id.)  He was "significant[ly]" weak in all planes.  (Id.)  He was tender over the acromioclavicular (AC) joint, the rotator cuff footprint, and the biceps tendon.  (Id.)  He had a positive impingement sign and a "mildly positive Hawkin's sign."[7]  (Id.)  X-rays showed "a type II/II acromion[8] and

_____

[6]A positive Tinel's sign is elicited "when lightly banging (percussing) over the nerve elicits a sensation of tingling . . . ."  MedicineNet.com, Definition of Tinel's sign, http://www.medterms.com/script/main/art.asp?articlekey=16687 (last visited Aug. 15, 2012).

[7]The Hawkin's sign is a subchondral radiolucent band seen on x-rays of a bone after six to eight weeks of disuse or immobilization.  Edwin F. Donnelly, M.D., The Hawkins Sign,

joint space narrowing of the AC joint, but no other osseous abnormalities." (Id.) (Footnote added.)

After being asked by Plaintiff's employer's worker's compensation coordinator to assume care of Plaintiff, Dr. Milne wrote the worker's compensation insurance carrier on August 30 that Plaintiff had a passive forward flexion in his left shoulder to 100 degrees, external rotation to 10 degrees, abduction and external rotation to 30 degrees, and internal rotation to 10 degrees.  (Id. at 363, 419.)  His strength was "markedly decreased." (Id.)  Dr. Milne's diagnosis was left shoulder partial thickness rotator cuff tear and left shoulder adhesive capsulitis[9]; his recommendation was that Plaintiff undergo a manipulation under anesthesia and fluoroscopic assisted cortisone injection, followed by physical therapy and use of a continuous passive motion (CPM) machine.  (Id.)

Shortly before Dr. Milne wrote his letter, Plaintiff rated his pain on a numeric pain scale as currently being an eight or nine, i.e., it made him bed ridden, at its lowest an eight or nine, and at its worst a ten, i.e., it was so bad he should seek emergency medical care and be in the hospital.  (Id. at 302.)  He also completed a pain disability index asking that he rate

---

http://radiology.rsna.org/content/210/1/195.full (last visited Aug. 9, 2012).

[8]The acromion is the lateral extension of the spine of the scapula (shoulder blade) which forms the highest part of the shoulder.   MedicineNet.com, Definition of Acromion, http://www.medterms.com/script/main/art.asp?articlekey=9699 (last visited Aug. 15, 2012).  A type II acromion is more curved than the normal, type I acromion and downward dipping; type II is hooked and downward dipping.  Allen E. Fongemie, M.D., Management of Shoulder Impingement Syndrome and Rotator Cuff Tears, http://www.aafp.org/afp/1998/0215/p667.html (last visited Aug. 15, 2012).

[9]Adhesive capsulitis is "a condition in which there is limitation of motion in a joint due to inflammatory thickening of the capsule, a common cause of stiffness in the shoulder."   Stedman's Medical Dictionary, 273 (26th ed. 1995).

the degree to which seven aspects of his life were disrupted by chronic pain.  (<u>Id.</u> at 303-05.)
On a scale from zero to ten, with zero being no disability and ten being total disability, he
rated the degree in each of the seven aspects as an eight or nine.  (<u>Id.</u> at 303-04.)  The seven
aspects were:  family/home responsibilities; recreation; social activity; occupation; sexual
behavior; self-care; and life-support activity.  (<u>Id.</u>)  Plaintiff's responses remained virtually
unchanged when he again completed a numeric pain scale and pain disability index on
September 6.[10]  (<u>Id.</u> at 306-09.)

That same day, the physical therapist wrote Dr. Enkvetchakul that Plaintiff had
attended three of five scheduled appointments and reported no significant changes in his
symptoms, included persistent shoulder pain and decreased mobility.  (<u>Id.</u> at 359-60.)  The
therapist noted that Plaintiff's responses to the pain disability index indicated that "he
perceive[d] himself at a high level of disability."  (<u>Id.</u> at 359.)

On September 10, Dr. Milne performed an examination and manipulation of Plaintiff's
left shoulder, under anesthesia, and administered a glenohumeral injection into the shoulder.
(<u>Id.</u> at 282-83, 417-18.)  The preoperative and postoperative diagnoses were left shoulder
adhesive capsulitis and left shoulder pain.  (<u>Id.</u> at 282.)  Plaintiff was to start physical
therapy, which he did on September 12.  (<u>Id.</u> at 283, 289-90, 380-82.)

---

[10]The only changes were a six to describe his lowest pain during the past month and the
addition of a seven to the eight and nine circled for three aspects on the index.

After the third session, on September 17, Plaintiff reported that he was not having "much pain" and was tolerating the range of motion and theraband exercises well.  (Id. at 378.)

The following day, Dr. Milne prescribed a four-week course of physical therapy with two to three sessions each week.  (Id. at 288.)  He noted that Plaintiff's range of motion was "much improved."  (Id. at 416.)

Between September 28 and November 5, inclusive, Plaintiff participated in ten physical therapy sessions.  (Id. at 368-77.)  At the October 24 session, Plaintiff reported increased pain after loading boards into a machine at work.  (Id. at 372.)  The physical therapist noted at the session on October 26, "[p]ain and verbal moaning at end ranges of flexion and abduction.  [Plaintiff] moves about clinic smiling and joking with staff; progresses program with no facial grimacing."  (Id. at 371.)  On October 31, the therapist noted that Plaintiff's exercises were limited secondary to complaints of pain, but he was "in no observable distress" and was "able to carry on normal conversation and joke with staff." (Id. at 369.)  Once in October and again in November, Plaintiff completed numeric pain scales and pain disability indexes; his responses remained virtually unchanged.  (Id. at 310-16.)

While participating in physical therapy, Plaintiff saw Dr. Milne on October 18.  (Id. at 414.)  Dr. Milne recommended he continue with physical therapy.  (Id. at 414.)

After seeing Plaintiff on November 15 and noting that he had a good range of motion but weak overall strength, Dr. Milne recommended he undergo arthroscopic surgery,

subacromial decompression, and rotator cuff repair.  (Id. at 413.)  Two weeks later, Plaintiff underwent a rotator cuff repair, subacromial, distal clavicle resection, and labral and glenohumeral debridement of his left shoulder.  (Id. at 284-85, 411-12.)  Dr. Milne described the repair as "excellent" and noted that the shoulder could be taken through a range of motion.  (Id. at 285, 412.)  Eight days later, with moderate guarding, Plaintiff had a passive range of motion in his left shoulder of 82 degrees on flexion, 90 degrees on abduction, 55 degrees on internal rotation, and 25 degrees on external rotation.  (Id. at 291-92.)  The active range of motion was greater:  162 degrees on flexion; 145 on abduction; 40 on internal rotation; and 86 on external rotation.  (Id. at 291.)  His muscle strength in his rotator cuff musculature was 4+/5.  (Id.)  Plaintiff was to continue with physical therapy and remain on light duty, including no use of his left arm.  (Id.)  Dr. Milne did not evaluate Plaintiff's complaints of right shoulder pain, which Plaintiff also attributed to the work injury, because he lacked authorization to do so.  (Id. at 292.)

Two days after the rotator cuff repair, Plaintiff completed another numeric pain scale and pain disability index; he rated his current pain as a ten and listed its affect on the seven aspects of life as ten.  (Id. at 317-20.)  The following month, the affect was a nine.  (Id. at 321-24.)

Plaintiff reported to the physical therapist on December 26 that throbbing pain had awoken him at 1:30 a.m. and that he had ridden in car for two hours en route to Branson for the holidays.  (Id. at 332.)  He tolerated all the physical therapy activities "without ill effects and leaves . . . in no apparent distress."  (Id.)  The physical therapy notes of the next day

report that Plaintiff had stated he had significant pain in his left shoulder and could not sleep in bed.  (Id. at 331.)  He tolerated all the physical therapy activities "without ill effects and leaves . . . in no apparent distress."  (Id.)  At his January 2, 2008, physical therapy session, Plaintiff continued to demonstrate improvement in range of motion; he tolerated all the physical therapy activities "without ill effects and le[ft] . . . in no apparent distress."  (Id. at 320.)

When seeing Plaintiff on January 3, Dr. Milne told him he wanted him to continue wearing the sling and with passive range of motion exercises for the next two weeks.  (Id. at 293-94, 333, 401-02, 410.)  After that, Plaintiff could discontinue wearing the sling and start active range of motion exercises.  (Id. at 293.)

Five days later, Plaintiff reported to the physical therapist that he had been in pain since 5:00 that morning.  (Id. at 329.)  The following day, January 9, his range of motion was limited secondary to pain and  muscle guarding.  (Id. at 328.)  As before, he tolerated all the physical therapy activities "without ill effects and le[ft] . . . in no apparent distress."  (Id.)  This same observation is repeated in the notes of January 16, together with a reference to Plaintiff having been at his Branson home for the past several days.  (Id. at 327.)  The following day, it is noted that pain continued to limit Plaintiff's passive range of motion; soreness continued to be present in his left shoulder.  (Id. at 326.)  On January 18, the physical therapist described Plaintiff as progressing well with no increased pain.  (Id. at 325.)  He tolerated all the physical therapy activities "without ill effects and le[ft] . . . in no apparent distress."  (Id.)  Plaintiff continued, however, to have soreness in his shoulders.  (Id.)

- 17 -

Plaintiff reported to Dr. Milne on January 29 that he was "doing alright," but was having "generalized shoulder aching." (Id. at 296.)  He further reported that he had been wearing his sling and doing the passive exercises. (Id.)  His passive range of motion was to 160 degrees on forward flexion; 120 degrees on abduction; 55 degrees on internal rotation; and 70 degrees on external rotation. (Id.)  His left hand was neurologically and neurovascularly intact. (Id.)  X-rays of the left shoulder showed the post-surgical changes; x-rays of the right shoulder showed a type III acromion and prominent spurring about the AC joint. (Id.)  Dr. Milne wanted Plaintiff to continue with the physical therapy, take an anti-inflammatory, participate in a home exercise program, and adhere to light duty work restrictions. (Id. at 279, 296, 399, 406.)  He could return to work with restrictions of not lifting more than fifteen pounds and not reaching, doing overhead work, pushing, or pulling. (Id.)  If his worker's compensation carrier approved, an MRI of his right shoulder would be performed. (Id. at 296.)  Dr. Milne listed diagnoses of rotator cuff tear, shoulder pain, and shoulder impingement – all for the left shoulder. (Id. at 279, 399, 406.)

Plaintiff telephoned Dr. Milne's office on February 4 and was told to continue icing his shoulder – he had stopped – and to try over-the-counter Aleve. (Id. at 299, 398.)

Between January 28 and February 20, inclusive, Plaintiff participated in ten physical therapy sessions. (Id. at 345-49, 351-52, 355-56.)  It was twice noted that pain limited his active range of motion. (Id. at 345, 348.)

During this time, on February 11, Dr. Milne replied, "Correct," to a faxed inquiry from Plaintiff's employer asking that he confirm that Plaintiff did not need to wear a sling on his

left arm and that he was able to work with restrictions of no lifting with his left upper extremity of anything heavier than fifteen pounds, no overhead reaching, and no pushing or pulling.  (Id. at 350.)

On February 25, Dr. Milne's only diagnosis was left rotator cuff tear.  (Id. at 281, 340, 404.)  The treatment was a home exercise program and physical therapy; work restrictions were limited use of the left arm and no lifting anything heavier than twenty-five pounds with the left arm.  (Id.)  Dr. Milne reported to Plaintiff's worker's compensation carrier that Plaintiff primarily complained of right shoulder pain with moving or lifting.  (Id. at 300, 339, 397.)  X-rays of the left shoulder showed a type II acromion and joint space narrowing at the AC joint.  (Id.)  Plaintiff requested an MRI of his right shoulder.  (Id.)  Dr. Milne opined that the right shoulder pain was not attributable to the work-related injury, but wanted to see Plaintiff after the MRI was done.  (Id.)  Dr. Milne's impression was of bilateral shoulder pain. (Id.)

Between February 25 and March 14, inclusive, Plaintiff participated in six physical therapy sessions.  (Id. at 334-37, 341, 386.)  Plaintiff continued to report pain when at his physical therapy sessions, even when taking pain medication.  At the March 3 session, he reported having increased pain when driving and riding in a car to Pinnacle Lake, approximately an hour away.[11]  (Id. at 335.)  On March 10, he reported that he might try to

_____

[11]See Bing Maps, http://www.bing.com/maps/?lvl=12&cp=38.82667 (last visited Aug. 9, 2012).

run a 5 K race on the upcoming St. Patrick's Day; his therapist recommended against it.  (Id. at 334.)

The diagnoses listed in Dr. Milne's notes of March 20 are the same as in January; the only treatment was physical therapy for two or three times a week for four weeks; and the only restriction was not to lift more than twenty-five pounds.  (Id. at 280, 385, 403.)  Dr. Milne wrote to Plaintiff's worker's compensation carrier that Plaintiff reported that he had been doing well until he had severely exacerbated his left shoulder at work the last Friday when using a vibrating lathe.  (Id. at 301, 396.)  His pain was increased; his range of motion and strength were decreased.  (Id.)  Also, his lower extremities had swollen.  (Id.)  On examination, Plaintiff had a range of motion in his left shoulder of 145 degrees on flexion, 140 degrees on abduction, 45 degrees on internal rotation, and 55 degrees on external rotation.  (Id.)   Plaintiff and his wife brought in a book about fibromyalgia and inquired about whether he could be suffering from that.  (Id.)  Dr. Milne recommended that a second opinion be obtained.  (Id.)

Plaintiff had an MRI of his right shoulder on March 31.  (Id. at 445-46.)  David Mueller, M.D., noted that the MRI was of "limited diagnostic quality secondary to patient motion degradation as well as decreased signal to noise."  (Id. at 275-76.)  His impression was of Type III acromion; right acromioclavicular joint arthrosis; marked insertional supraspinatous and infraspinatus tendinesis; a rim rent tear of the supraspinatous tendon; a partial thickness articular-sided tear insertional supraspinatus/infraspinatus interval; bursal sided fraying; artifact along the proximal extra-articular bicipital tendon sheath of uncertain

etiology; and questionable degenerative frayed appearance of the superior right glenoid labrum posterior to the biopital anchor.  (Id. at 276.)  The next day, Dr. Milne recommended that Plaintiff obtain a second opinion about his left shoulder.  (Id. at 405.)

Plaintiff consulted James C. Strickland, M.D., on April 4 about pain in his right shoulder.  (Id. at 390-92.)  He explained that, although he had had problems with the shoulder before, it had been "doing very well" until he injured it at work the previous September.  (Id. at 392.)  Dr. Strickland referred Plaintiff to Dr. Rothrock.  (Id.)

Dr. Milne wrote the worker's compensation insurance carrier on April 10 that Plaintiff was "neurologically and neurovascularly intact" about the left and right upper extremities. (Id. at 395.)  His passive range of motion in the left upper extremity was 170 degrees of flexion, 165 degrees of abduction, 70 degrees of internal rotation, and 90 degrees of external rotation.  (Id.)  His rotator cuff musculature strength was 4/5.  (Id.)  Plaintiff had a limited range of motion in his right shoulder secondary to pain.  (Id.)

Four days later, Plaintiff consulted Robert H. Sigmund, M.D., about his right shoulder pain.  (Id. at 453-54.)  On examination, he had "fairly reasonable motion" in that shoulder. (Id. at 453.)  There was no evidence of adhesive capsulitis.  (Id.)  He had full internal and external rotation, but was tender at the extreme ranges.  (Id.)  The anterolateral aspect of the shoulder was mildly tender; the acromioclavicular joint, clavicle, and sternoclavicular joint were not tender.  (Id. at 454.)  His scapulothoracic articulation was normal, and there was no evidence of instability.  (Id.)  X-rays of the shoulder revealed no obvious fracture or subluxation.  (Id.)  "His acromion appear[ed] to be a type II going into a type III."  (Id.)  He

- 21 -

had "quite a bit of insertional supraspinatous and infraspinatus tendonitis," a partial thickness tear, a trace amount of fluid in the subdeltoid and subacromial bursa region, and a frayed appearance to his labrum and biceps anchor, this latter a result of his previous rotator cuff tear.  (Id.)  Plaintiff wished to proceed with an arthroscopic evaluation of the shoulder.  (Id.) Consequently, nine days later, Plaintiff underwent a right shoulder arthroscopy with rotator cuff repair, labral debridement, biceps debridement, subacromial decompression, and acromioplasty.  (Id. at 462-63.)  The postoperative diagnoses were right shoulder rotator cuff tear, labral fraying, biceps tendinitis, and impingement.  (Id. at 462.)  Dr. Sigmund then referred Plaintiff to physical therapy, three times a week for one month.  (Id. at 461.)  After Plaintiff complained of shortness of breath when taking the Percocet prescribed after the surgery, he was prescribed Vicodin and told to call if the symptoms persisted.  (Id. at 452.)

At a follow-up visit on April 30, Plaintiff reported doing okay and denied having any new problems.  (Id. at 451.)  He had good internal and external rotation.  (Id.)  Dr. Sigmund was able to passively flex and abduct his right shoulder to 90 degrees.  (Id.)  He was to continue working on his passive range of motion and refrain from engaging in an active range of motion.  (Id.)  Dr. Sigmund opined that Plaintiff would be able to return to work in approximately three weeks.  (Id. at 457.)

After seeing Plaintiff on May 28 and noting that he continued to have some pain in his shoulder and to require pain medication, albeit infrequently, Dr. Sigmund released him to return to work in approximately one month.  (Id. at 450, 456.)  He also noted that Plaintiff's range of motion was "coming along very well."  (Id. at 450.)  After seeing Plaintiff

- 22 -

on July 7, Dr. Sigmund again released him to return to work in approximately one month. (Id. at 449, 455.)  At that time, Plaintiff had not had any setbacks and was ready to regain his strength.  (Id. at 449.)

Plaintiff underwent an independent medical evaluation by Richard C. Lehman, M.D., on May 27.  (Id. at 428-32.)  He had a limited range of motion in his left shoulder and pain with full forward flexion.  (Id. at 431.)  He had soreness with elevation of his shoulder and complaints of pain in the shoulder; "[t]hey appear[ed] to be somewhat non-physiologic." (Id.)  He had pain in the thumbs down position and with external and internal rotation.  (Id.) He did not have any evidence of redness, increased heat, swelling, instability, popping, grinding, or mechanical loss.  (Id.)  He had "a very minimal crepitus in the shoulder."  (Id.) Dr. Lehman opined that Plaintiff's complaints of pain seemed "to be somewhat in excess of his objective examination."  (Id.)  He recommended that Plaintiff have a post-arthroscopic MRI of his shoulder.  (Id.)  Should the MRI be negative, Dr. Lehman opined that Plaintiff would be at maximum medical benefit and able to work without restrictions.  (Id.)

Plaintiff reported to Dr. Rickmeyer on June 3 that he was continuing to have pain in his left shoulder.  (Id. at 436.)  He had a decreased range of motion in that shoulder to "about 30%."  (Id.)  He was discouraged about gaining weight; he then weighed 236 pounds.  (Id.) If he was unable to lose weight and thereby lower his blood pressure, Dr. Rickmeyer

anticipated placing him on anti-hypertensives.  (Id.)  Plaintiff informed Dr. Rickmeyer that he was "seeing Dr. Njince for fibromyalgia."[12]  (Id.)

Plaintiff was seen by Dana Hellebusch, a registered nurse practitioner, with Patients First on September 25.  (Id. at 470-72.)  He reported that his right rotator cuff had fully healed; his left continued to cause pain.  (Id. at 470.)  An MRI could not be done on the left shoulder due to debris.  (Id.)  He was diagnosed with myalgia and myositis, unspecified; hypertension; and morbid obesity.  (Id.)  On examination, he was in no apparent distress. (Id.)  His affect was normal, as was his judgment, insight, attention span, and concentration. (Id. at 471.)  He was, however, having problems with anxiety, which the nurse practitioner attributed to the shoulder issues, having to be off work, and problems with worker's compensation.  (Id.)  An anti-anxiety medication, Lexapro, was given.  (Id.)  He had pain with range of motion extension in his left shoulder.  (Id.)  It was recommended that he consult an orthopedic surgeon about his left shoulder problems.  (Id.)

The ALJ also had before him an assessment of Plaintiff physical residual functional capacity and an evaluation of his mental health.

In August 2008, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Lisa Buhr, who was a "single decisionmaker"[13] and not a medical

---

[12]Plaintiff later informed Dr. Volarich, see pages 31 to 32, infra, that he had seen Dr. "Ince" only once.  (See id. at 494.)

[13]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decisionmaker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

consultant.  (Id. at 464-69.)  The primary diagnosis was status-post bilateral rotator cuff repair; the secondary diagnoses were high blood pressure and fibromyalgia.  (Id. at 464.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and, stand, walk, or sit for approximately six hours in an eight-hour day.  (Id. at 465.)  His ability to push and pull was otherwise unlimited.  (Id.)  He had no postural, visual, or communicative limitations.  (Id. at 466-68.)  He was limited in his ability to reach in all directions, including overhead, but had no other manipulative limitations.  (Id. at 467.)  He also had environmental limitations of needing to avoid concentrated exposure to extreme cold and vibrations.  (Id. at 468.)

At the request of Plaintiff's counsel and on "short notice," he was evaluated by John B. Crane, M.D., F.A.P.A., in September 2009.  (Id. at 473-87.)  Plaintiff saw Dr. Crane twice.  (Id. at 484-87.)  Plaintiff reported to Dr. Crane that he had gone to school for business management and had worked at Six Flags after his former employer would not put him back to work following a work-related injury to both shoulders.  (Id. at 474.)  The job at Six Flags was stressful and caused him to have "'a breakdown'" at one point and be hospitalized for three days.  (Id.)  The Lexapro he had been prescribed for anxiety was not effective.  (Id.) He did not sleep for more than two or three hours a night.  (Id. at 474, 485.)  He had been tested for Attention Deficit Hyperactivity Disorder (ADHD) and found to have it.  (Id.)  He does better when he does not have to work with a boss.  (Id. at 474, 486.)  The pain medication he takes for his shoulders makes his sleeping problems worse.  (Id. at 475.)  He does not allow his wife to drive and gets angry with her when she gets upset when he falls

asleep driving.  (Id. at 475, 484.)  He is depressed.  (Id. at 475, 485.)  When he goes through

a period of sleeplessness, he is unable to concentrate.  (Id. at 475.)  He had been discharged

from the Marines after injuring himself helping his father put hot tar on a roof; the resulting

burns required that he be hospitalized for longer than one month.  (Id. at 475, 486.)  When

he started driving trucks, his sister would go with him to keep him awake.  (Id.)  He appeared

"to be tense and anxious and somewhat depressed."  (Id.)  He had no evidence of psychotic

thought content or thought disorder and did have appropriate thought content and logical and

coherent associations.  (Id.)  Dr. Crane wrote:

> Diagnostically this man presents something of a challenge.  Because of the
> history of depressive episodes and his description of his mind constantly going
> and being unable to sleep, except for short intervals, the question of Bipolar
> Disorder must be raised.  His impulsiveness and tendency to irritability and
> inability to get along with supervisors would be consistent with this diagnosis.

(Id. at 475-76.)

On a Mental Residual Functional Capacity Questionnaire, Dr. Crane listed diagnoses

of rule out[14] bipolar disorder; rule out ADHD; and rule out narcolepsy.  (Id. at 478.)

Plaintiff's prognosis was good "once he [was] properly diagnosed and treated."  (Id.) Of the

mental abilities and aptitudes needed to do unskilled work, Plaintiff was seriously limited but

not precluded in four of the sixteen abilities and aptitudes listed, was unable to meet

competitive standards in six, and had no useful ability to function in the remaining six.  (Id.

at 479.)  Of the four mental abilities and aptitudes needed to do semiskilled and skilled work,

---

[14]"'Rule out' in a medical record means that the disorder is suspected, but not confirmed – i.e.,
there is evidence that the criteria for a diagnosis may be met, but more information is needed in order
to rule it out." **Byes v. Astrue**, — F.3d — , 2012 WL 3116243, *5 n.3 (8th Cir. 2012).

Plaintiff was seriously limited but not precluded in two and was unable to meet competitive standards in two.  (Id. at 480.)  Of the five mental abilities and aptitudes needed to do particular types of jobs, Plaintiff was seriously limited but not precluded in one, unable to meet competitive standards in one, and was unlimited or very good in three:  adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; or use public transportation. (Id.)  His impairments would cause him to be absent from work more than four days a month and were expected to last at least twelve months.  (Id. at 481.)

## The ALJ's Decision

Analyzing Plaintiff's application under the Commissioner's five-step evaluation procedure, the ALJ first found that he met the Act's insured status requirements through December 31, 2013, and had not engaged in substantial gainful activity since the alleged onset date of November 27, 2007.  (Id. at 12-13.)  At step two, the ALJ found that Plaintiff had "residuals related to left shoulder injuries including rotator cuff tear, partial labral tear, impingement and acromioclavicular arthrosis." (Id.)  He was "reported with anxiety."  (Id.) The ALJ found at step three that these impairments did not, singly or in combination, meet or medically equal an impairment of listing-level severity.  (Id.)

The ALJ then assessed Plaintiff's residual functional capacity (RFC).  (Id. at 14.)  He concluded that Plaintiff had the RFC to perform light work[15] except he could not climb ramps, stairs, ropes, ladders, or scaffolds; could not reach higher than waist level; must avoid

_____

[15]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

all exposure to cold and vibrations; and could have only occasional contact with the public and co-workers.  (Id.)  In so finding, the ALJ considered the lack of any evidence to support Plaintiff's allegations of a disabling mental impairment, noting that (i) a registered nurse practitioner made the diagnosis of anxiety and prescribed Lexapro the same day Plaintiff's affect and other indicia of mental status, e.g., judgment and concentration, were described as normal; (ii) Plaintiff had no ongoing and frequent treatment for mental health complaints by a psychiatrist, psychologist, medical doctor, or counselor; and (iii) the treatment notes of Plaintiff's physicians and physical therapists do not include any ongoing mental complaints or any observations of any symptoms indicative of a mental problems and some include Plaintiff's denials of mental health related symptoms.  (Id. at 14-15.)  Also detracting from Plaintiff's allegations of a severe mental impairment were the findings of Dr. Crane that he had no evidence of psychotic thought content or thought disorder.  (Id. at 15.)  And, although Plaintiff "alleged very poor sleep and significant fatigue," the records did not reflect such and did reflect no significant loss of strength or fatigue-related atrophy.  (Id.)  Dr. Crane's findings of episodes of Plaintiff abruptly falling asleep and being unable to sleep, together with the effect of such difficulties, were apparently based on Plaintiff's allegations and lacked support in the record.  (Id. at 16.)  The ALJ also noted that Dr. Crane did not render a confirmed medical diagnosis but simply listed diagnoses that should be ruled out.  (Id.)  Dr. Crane's assessment of Plaintiff's functional limitations were "grossly inconsistent" with the lack of a diagnosis and with Plaintiff's treatment notes.  (Id.)  Accordingly, the ALJ declined to give any weight to Dr. Crane's conclusions.  (Id.)

The ALJ also declined to find that Plaintiff had fibromyalgia, noting that the diagnosis of Dr. Rickmeyer was apparently based on Plaintiff's report that he had been diagnosed with such by a Dr. Njince, that Dr. Milne did not render a diagnosis of fibromyalgia after Plaintiff and his wife gave him a book about such, and that there had been no treatment for or ongoing diagnosis of fibromyalgia.  (Id.)  Recognizing that a diagnosis of fibromyalgia cannot be made based on objective methods, e.g., laboratory tests, the ALJ noted that Plaintiff had not established that he satisfied the criteria of the American College of Rheumatology for a diagnosis of fibromyalgia.  (Id. at 17.)

Addressing Plaintiff's complaints of disabling left shoulder pain, the ALJ concluded that the findings and treatment records of Drs. Milne and Lehman and their respective observations about the lack of an explanation for that pain were inconsistent with Plaintiff's complaints of "a severe or even medically determinable impairment affecting the left shoulder . . . ."  (Id. at 17-18.)  Addressing Plaintiff's complaints of disabling right shoulder pain, the ALJ noted that there was no "documented history of injury to the right shoulder with an onset of November 2007."  (Id. at 18.)  Following surgery in April 2008, the shoulder was fine and had a good range of motion.  (Id.)  Moreover, Plaintiff reported that he was "'doing very well'" and required only infrequent pain medication.  (Id. at 18-19.)  Medical records of June 2008, July 2008, and October 2008 reflected continued improvement in that shoulder.  (Id. at 19.)

Additionally detracting from Plaintiff's credibility were the lack of any persistent and adverse medication side effects; the lack of any restrictions, physical or mental, imposed by

Plaintiff's physicians; the absence of any long-term and significant atrophy or loss of muscle tone; and the lack of any report that Plaintiff was in acute distress, or was exhibiting significant pain behaviors or signs. (Id. at 19-20.) The ALJ noted that Plaintiff had described significantly limited daily activities, but also noted that the allegations were "not self-prov[ing]." (Id. at 20.) And, although Plaintiff had a good earning record, any positive effect of that record on an assessment of his credibility was outweighed by the other considerations cited. (Id.)

Considering Plaintiff's age (closely approaching advanced age), education, and ability to communicate in English, Plaintiff was not disabled under the Medical-Vocational Guidelines regardless of whether he possessed any transferable skills. (Id.) And, considering his age, education, and RFC, there were jobs described by the VE that he could perform. (Id. at 21.) Consequently, Plaintiff was not disabled within the meaning of the Act. (Id.)

### Additional Records Before the Appeals Council

After the ALJ rendered his adverse decision, Plaintiff submitted additional medical records to the Appeals Council.

Plaintiff consulted Ms. Hellebusch at Patients First on September 14, 2009, reporting that the Lexapro was not helping and he was not sleeping well. (Id. at 504-05.) On examination, he was "positive" for anxiety, appropriate interaction, depression, and "psychiatric symptoms"; he was negative for, among other things, combativeness, difficulty concentrating, inability to focus, mood swings, obsessiveness, and sleep disturbances. (Id. at 504.) He was oriented to time, place, person, and situation and had a normal affect,

insight, judgment, attention span, and concentration.  (Id. at 505.)  He was not forgetful or having memory loss.  (Id.)  His Lexapro dosage was increased, and he was to follow up in two weeks or sooner if his symptoms did not improve.  (Id.)  He was to improve his eating habits and begin walking daily for thirty minutes.  (Id.)

At the request of Plaintiff's worker's compensation counsel, Plaintiff was evaluated by David Volarich, D.O., in November 2009.  (Id. at 490-502.)  After summarizing, in detail, Plaintiff's medical records, beginning with a work-related injury to his shoulders in August 1985, Dr. Volarich noted Plaintiff's complaints of ongoing, equal pain in both shoulders.  (Id. at 492-94.)  He could not raise his arms overhead without pain and could not throw overhead. (Id. at 494-95.)  Pain radiated from his shoulders to his elbows and numbness radiated to his right thumb.  (Id. at 495.)  He had numbness and tingling in all his fingers.  (Id.)  During the day, he watched a lot of television; he did not do any household chores and used a riding mower when cutting the grass.  (Id.)  He slept for two to three hours a night before shoulder pain woke him.  (Id.)  His only medication was Lexapro prescribed by Dr. Crane.  (Id. at 496.)  He had completed the tenth grade, obtained a General Equivalency Degree (GED), and had two years of college.  (Id.)  Dr. Volarich's examination was limited to Plaintiff's upper extremities.  (Id.)  Plaintiff had weak shoulder strength, biceps, triceps, and forearms at 4/5. (Id.)  He had diminished pinprick sensation throughout both upper extremities from the neck into the arms.  (Id.)  His deep tendon reflexes were 1/4 and symmetric.  (Id. at 497.)  His gait was normal, and he was able to fully squat and to stand back upright to an erect position without difficulty.  (Id.)  He had a 35-40% loss in motion; impingement testing was

- 31 -

moderately positive.  (Id.)  He had a normal range of motion at both elbows on flexion, supination, and pronation, but not on extension.  (Id.)  Dr. Volarich diagnosed Plaintiff with internal derangement of the right and left shoulders, persistent right and left shoulder pain, right shoulder labral tear; and bilateral shoulder impingement and rotator cuff tendonitis.  (Id. at 498-99.)  He opined that Plaintiff had a 45% permanent partial disability of the left upper extremity rated at the shoulder and a 30% permanent partial disability of the right upper extremity rated at the shoulder.  (Id. at 499-500.)  He further opined that Plaintiff "may be able to perform some work activities on a limited basis with" several restrictions, including needing to avoid all overhead use of the arms, prolonged use of the arms away from the body, and handling of weights greater than three to five pounds with the arms extended away from the body or overhead.  (Id. at 500-01.)  He should minimize pushing and pulling.  (Id. at 501.)

Plaintiff returned to Patients First on January 26, 2010, to see Dr. Rickmeyer after falling the previous month in a department store bathroom.  (Id. at 506-09.)  Since the fall, he was having "sudden changes in his demeanor," including becoming very anxious, having an increased appetite, sleeping until 10:30 a.m. or noon, and having some blurred vision.  (Id. at 506.)  A computed tomography (CT) scan of his head revealed no acute intracranial processes.  (Id. at 509.)

Dr. Sigmund saw Plaintiff on April 19 for his left shoulder pain.  (Id. at 513-15.)  Plaintiff reported that his right shoulder was "functioning well," but his left was not.  (Id. at 513.)  That shoulder was continuing to "click, pop and grind" and be painful.  (Id.)  He had difficulty trying to reach overhead and to the side.  (Id.)  Although his strength was

increasing, it still hurt "too much" to lift anything.  (Id.)  He did not participate in a regular exercise program.  (Id.)  On examination, he had difficulty trying to fully abduct his left shoulder.  (Id.)  An impingement sign was mildly positive.  (Id. at 514.)  His acromioclavicular joint, clavicle, and sternoclavicular joint were not tender.  (Id.)  Dr. Sigmund's diagnosis was of left shoulder pain, weakness, and subacromial bursitis.  (Id.)  He opined that Plaintiff would benefit from an arthroscopy of the left shoulder to investigate what was happening with the rotator cuff and inside part of the articular surface.  (Id.)  Plaintiff agreed to proceed.  (Id. at 515.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).  First, the claimant

cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(b);

**Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R.

§ 404.1520(c).  A "severe impairment" is "any impairment or combination of impairments

which significantly limits [claimant's] physical or mental ability to do basic work

activities . . . ."  Id.  Accord **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011); **Pelkey v.**

**Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006).  Conversely, "[a]n impairment is not severe if

it amounts only to a slight abnormality that would not significantly limit the claimant's physical

or mental ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's

ability to work . . . ."  **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007).  "Severity is not an

onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ."  **Id.**

at 708 (internal citations omitted).

At the third step in the sequential evaluation process, the ALJ must determine whether

the claimant has a severe impairment which meets or equals one of the impairments listed in

the regulations and whether such impairment meets the twelve-month durational requirement.

See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these

requirements, he is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**,

29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a

claimant can do despite [his] limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R.

§ 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's

office; it is the ability to perform the requisite physical acts day in and day out, in the

sometimes competitive and stressful conditions in which real people work in the real world."
**Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted).  Moreover, "'a claimant's RFC [is] based on all relevant evidence including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).   "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. [A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

     In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001).  This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'"  **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524, which cited Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the

- 35 -

ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" **Id.** (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)).  After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).  The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

- 36 -

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If, [however,] after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

**Discussion**

Plaintiff argues that the ALJ erred when assessing his RFC by not basing it on the medical evidence of record and that this error led to a flawed question to the VE.

The ALJ found that Plaintiff had the RFC to perform light work, e.g., he could lift twenty pounds at a time and could frequently lift or carry objects weighing up to ten pounds; could not climb ramps, stairs, ropes, ladders, or scaffolds; could not reach higher than waist level; must avoid all exposure to cold and vibrations; and could have only occasional contact with the public and co-workers.

As noted above, "[t]he RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting Social Security Ruling 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003).  "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023.  See also Social Security Ruling 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment").  An ALJ does not, however, fail in his duty to assess

- 38 -

a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Depover**, 349 F.3d at 567. Instead, an ALJ who specifically addresses the areas in which he found a limitation but is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68. See also **Craig v. Apfel**, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.").

In support of his argument that the ALJ erred in his RFC assessment, Plaintiff cites Dr. Enkvetchakul's July 2007 restriction that Plaintiff work with his left arm at his side and; Dr. Milne's lifting restrictions, i.e., nor more than ten pounds in August 2007, no more than fifteen pounds in January 2008, and no more than twenty-five pounds in March 2008, and his restrictions of no reaching, overhead work, or pushing or pulling with his left arm; Dr. Strickland's lack of restrictions; and Dr. Volarich's restrictions in November 2009.

Dr. Enkvetchakul treated Plaintiff for left arm pain following his work-related injury in 2007. After examining Plaintiff, Dr. Enkvetchakul diagnosed him with left arm pain, prescribed a pain reliever and physical therapy, and restricted Plaintiff to modified duty. Two visits later, Dr. Enkvetchakul noted Plaintiff's lack of reported improvement, described his pain complaints as being in "a somewhat bizarre pattern," see Record at 271, noted that the pain location varied with the motion, and determined that the left shoulder pain was of uncertain etiology. He last examined Plaintiff in July 2007 – four months before Plaintiff's alleged disability onset date. Dr. Milne first examined Plaintiff in August 2007. By January

- 39 -

2008, he had released Plaintiff to return to work with a fifteen-pound lifting restriction and no reaching, doing overhead work, pushing, or pulling.  Two months later, the lifting restriction was increased to twenty-five pounds – within the ALJ's RFC restrictions – and the earlier postural limitations were not again imposed.  Three months later, in April 2008, Dr. Milne described Plaintiff as being "neurologically and neurovascularly intact" in both upper extremities.  (See R. at 395.)  Plaintiff's passive range of motion in his left shoulder had increased significantly, e.g., from 90 degrees on forward flexion in August 2007 to 170 degrees.

Thus, if *all* the evidence is considered, as the ALJ was obligated to do, the ALJ's RFC is supported by substantial evidence.  See **Martise**, 641 F.3d at 926-27 (ALJ fails in duty to develop medical record only if the medical records before him to do not provide sufficient evidence for him to determine whether claimant is disabled).  Nor was it less so because Dr. Strickland did *not* impose any work-related restrictions when seeing him one time for his right shoulder pain.  Additionally, the Court notes that Dr. Volarich's findings, also relied on by Plaintiff, were not before the ALJ and were issued pursuant to Plaintiff's worker's compensation claim at his counsel's request.

Plaintiff also challenges the ALJ's failure to recognize his severe mental impairment, as evidenced by the report of Dr. Crane.  The ALJ declined to give any weight to Dr. Crane's

conclusions about Plaintiff's mental residual functioning capacity,[16] finding them not to be supported by the record and to be inconsistent with Dr. Crane's lack of a diagnosis.

Plaintiff was evaluated by Dr. Crane at his counsel's request.  Describing Plaintiff as presenting something of a diagnostic "challenge," see Record at 475, Dr. Crane noted that he had no *evidence* of psychotic thought content or thought disorder, but did have appropriate thought content and logical and coherent associations.  Plaintiff appeared to be tense, anxious, and "*somewhat* depressed."  (See R. at 475.) (Emphasis added).  Dr. Crane also noted Plaintiff's report of a diagnosis of ADHD – not mentioned anywhere else in the records – and his *complaints* of occasional sleeplessness and inability to concentrate and of depression, irritability, impulsiveness, and inability to get along with supervisors.  Dr. Crane made no diagnosis; instead, he listed three diagnoses that needed to be ruled out.  The omitted restrictions advocated by Plaintiff are ones that the ALJ found were based on his allegations and were not otherwise supported by the record.

"A treating physician's[17] opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'"  **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original) (footnote

_____

[16]The Court notes that the ALJ's RFC finding that Plaintiff should have only occasional contact with the public and co-workers did include Dr. Crane's conclusion that Plaintiff was "seriously limited" in his ability to interact appropriately with the public.  (See R. at 480.)

[17]Plaintiff describes Dr. Crane as his treating physician.  That description is not supported by the record; however, the issue has not bearing on the outcome of Plaintiff's argument.

- 41 -

added); accord **Halverson**, 600 F.3d at 929; **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009).  "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole."  **Wagner**, 499 F.3d at 849 (internal quotations omitted).  And, it is permissible for an ALJ to discount an opinion of a treating physician when it is primarily based on the claimant's subjective complaints.[18]  **Renstrom**, 680 F.3d at 1064; **Teague v. Astrue**, 638 F.3d 611, 616 (8th Cir. 2011); **Kirby**, 500 F.3d at 709.

For the foregoing reasons, the ALJ did not err in not incorporating all of Dr. Crane's conclusions about Plaintiff's mental residual functioning capacity assessments in his RFC.

Plaintiff next argues that the ALJ erred by not including in his hypothetical question to the VE all the concrete consequences of his impairments.  He correctly notes that hypothetical questions should do so.  See **Renstrom**, 680 F.3d at 1067; **Jones**, 619 F.3d at 972.  "The ALJ's hypothetical question to the [VE] needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.'"  **Renstrom**, 680 F.3d at 1067 (quoting Martise, 641 F.3d at 927).  The question need not incorporate additional limitations properly disregarded by the ALJ.  **Id.**  Such limitations may include those based on a discounted claimant's subjective complaints and those based on medical opinions that the ALJ has given less weight to than to others.  **Id.**  Accord **Perkins v. Astrue**, 648 F.3d 892, 902 (8th Cir. 2011); **Heino v. Astrue**, 578 F.3d 873, 882 (8th Cir. 2009).  In the instant case, the ALJ posed a hypothetical question to the VE that encompassed the concrete

---

[18]Plaintiff does not challenge the ALJ's credibility determination.

consequences of the impairments he found to be supported by substantial evidence on the record as a whole.  The question was, therefore, proper.

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010).  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  30th  day of August, 2012.